652 S.E.2d 266 (2007)
In the Matter of J.G., (a.k.a. J.M.G. and J.M.S.).
No. COA06-752.
Court of Appeals of North Carolina.
November 6, 2007.
Office of the Guilford County Attorney, by Deputy County Attorney James A. Dickens, for Guilford County Department of Social Services, petitioner-appellant.
Smith, James, Rowlett & Cohen, L.L.P., by Margaret Rowlett, Greensboro, for Guardian ad Litem; and Legal Aid of N.C., by Attorney Advocate Lewis Pitts, Durham, for respondent-juvenile-appellee.
Nelson Mullins Riley & Scarborough LLP, by Matthew P. McGuire and Amy L. Keegan, Raleigh, for North Carolina Justice Center, Carolina Legal Assistance, and the Pulpit Forum of Clergy, Greensboro and Vicinity; and Charm M. Nichol, Butner, for Governor's Advocacy Council for Persons with Disabilities, Amici Curiae.
Edelstein & Payne, by M. Travis Payne, Raleigh; and Sullivan & Worcester LLP, by Patrick P. Dinardo, Beth Jacobson, and Jennifer L. Sullivan, Boston, MA, for First Star, Amicus Curiae.
Paul Meyer, Raleigh, for North Carolina Association of County Commissioners, Amicus Curiae.
JACKSON, Judge.
John C. ("the biological father") and Willie G. ("the biological mother") are the parents of the minor child J.G., who was born on 9 July 1990. The trial court terminated the biological father's parental rights to J.G., and the biological mother subsequently married Tracy S. ("Tracy") on 16 August 1991. On 15 December 1992, Tracy adopted J.G. as his son, and a week later, the biological mother and Tracy purchased a house from Habitat for Humanity ("the Habitat home").
In April 1993, the biological mother abandoned Tracy and J.G., and on 27 August 1993, Tracy executed a will in which he devised all of his property  including the Habitat home  to a testamentary trust for J.G. Tracy also appointed his girlfriend, Connie Bell ("Bell"), as J.G.'s guardian and Dawson Deese ("Deese"), his uncle, as executor and trustee, with Bell as an alternate executrix and trustee.
On 5 November 1993, Tracy was granted both a divorce from bed and board from the biological mother and sole and exclusive permanent custody of J.G. The biological mother was divested of all rights in the Habitat home and was denied any visitation rights with J.G. On 14 January 1994, the trial court terminated the biological mother's parental rights. On 3 February 1994, Tracy died.
On 18 March 1994, Bell was appointed J.G.'s general guardian. As Tracy's legally adopted son, J.G. received Social Security benefits after Tracy's death, and Bell was responsible for accounting for the Social Security checks, making the payments on the mortgage on the Habitat home ("the Habitat mortgage"), and taking care of the Habitat home. On 5 December 1994, Habitat for Humanity notified Bell, Deese, and the Clerk of the Guilford County Superior Court that Bell was delinquent in making the mortgage payments. On 17 January 1995, J.G.'s maternal uncle, George Jennings ("Jennings"), filed a petition to remove Bell as J.G.'s guardian, alleging that Bell had appropriated J.G.'s Social Security benefits to her own use. *268 On 7 February 1995, Bell and Jennings entered into a consent order that provided for: (1) J.G. to continue residing with Bell; (2) Deese to be the payee for the Social Security benefits; and (3) Deese to make the mortgage payments to Habitat for Humanity.
On 3 October 1997, the Guilford County Department of Social Services ("DSS") filed a petition to remove J.G. from Bell's custody, alleging that Bell neglected J.G. and used improper physical discipline on him. J.G. told an employee of the Child Evaluation Clinic that Bell drank and abused him on a daily basis, whipping him with a belt, a coat hanger, and various other items. On 17 December 1997, the trial court adjudicated J.G. as neglected. The guardian ad litem did not agree to a reunification plan with Bell, and the trial court ordered J.G. to remain in the legal and physical custody of DSS pending further investigation.
On 6 February 1998, the guardian ad litem reported to the trial court that, notwithstanding Deese's appointment as J.G.'s general guardian, Bell had resumed converting J.G.'s Social Security benefits to her own use as of the spring of 1997 and that no payments had been made on the Habitat mortgage since May 1997. The guardian ad litem recommended placing J.G. with a relative that was willing and able to assume custody of J.G. and reside at the Habitat home.
On 6 February 1998, the trial court ordered that DSS had the authority to place J.G. in the physical custody of his maternal aunt, Arnita Gibson ("Gibson"), and Gibson later informed DSS that she wanted to adopt J.G. Deese, meanwhile, died on 18 October 1998. On 14 May 1999, a social worker reported that J.G., who was in second grade at the time, was exhibiting behavioral problems at school, and on 9 February 2001, DSS again reported that J.G. was exhibiting behavioral problems at home and at school. On 3 August 2001, DSS reported that J.G. was doing better in school, both behaviorally and academically. During the time J.G. was in DSS custody, DSS paid the mortgage on the Habitat home where Gibson and J.G. resided.
On 18 March 2003, Gibson adopted J.G. and court supervision ceased. Thereafter, Gibson became the representative payee for J.G.'s Social Security benefits, which totaled approximately $571.00 per month. Gibson also received an adoption subsidy of approximately $500.00 per month. The monthly payment on the Habitat mortgage was approximately $221.00.
On 11 December 2003, J.G. was adjudicated delinquent for one count of misdemeanor stolen property, one count of simple assault, and one count of second-degree trespass. On 1 March 2004, the trial court placed J.G. on probation for twelve months. On 20 April 2004, Gibson filed a juvenile petition stating that J.G. ran away from home for a period of more than twenty-four hours. On 22 April 2004, a motion for review was filed after J.G. violated the terms of his probation. The court appointed a guardian ad litem on 26 April 2004 and ordered DSS to determine whether a dependency petition should be filed on J.G.'s behalf. On 20 May 2004, J.G. was placed in a group home, and on 27 May 2004, the guardian ad litem reported that J.G. did not wish to return to his adoptive mother's home. Specifically, J.G. stated that (1) his aunt put him out on the front porch every morning at 4:00 a.m.; (2) he did not have clothes that fit him; (3) he did not get along with his aunt's boyfriend; and (4) he believed that his aunt only wanted his money. The guardian ad litem also reported that J.G. was concerned both about the condition of the Habitat home and that it could be taken away as a result of delinquent mortgage payments.
On 26 July 2004, J.G. again was placed into DSS custody, and the trial court ordered DSS to investigate the status of J.G.'s estate and the best way to preserve it for him. While J.G. was in DSS custody, Gibson and her boyfriend continued to live in the Habitat home. On 28 March 2005, while J.G. still was in the custody of DSS, Gibson relinquished her parental rights to J.G. Thereafter, Gibson and her boyfriend abandoned the Habitat home, which fell into a state of disrepair and was vandalized.
On 5 October 2005, the trial court adjudicated J.G. dependent and ordered that he remain in the legal and physical custody of DSS. Thereafter, DSS became the representative *269 payee of J.G.'s Social Security benefits. DSS made no payments toward the Habitat mortgage. Instead, DSS applied those funds, which amounted to approximately $538.00 per month, toward the cost of J.G.'s foster care, which amounted to approximately $1,300.00 per month for room and board at a therapeutic foster home. In 2005, the Habitat home was valued at approximately $80,000.00, and Habitat for Humanity held the outstanding mortgage of approximately $27,000.00. Because the mortgage was not being paid, Habitat for Humanity initiated foreclosure proceedings.
On 23 November 2005, the guardian ad litem filed a motion to protect J.G.'s reasonably foreseeable needs. By order filed 20 December 2005, the trial court found that DSS's use of J.G.'s Social Security benefits to reimburse itself, rather than make the $221.00 monthly Habitat mortgage payment, had not been reasonable. The court reasoned that J.G. will need the Habitat home as a residence when he turns eighteen years old and ages out of the foster care system. The court ordered DSS to use a portion of J.G.'s Social Security benefits to pay: (1) the monthly mortgage on his home; (2) $2,800.00 for the past-due mortgage payments on the house;[1] and (3) $1,000.00 for repairs to the house. On 21 December 2005, DSS filed notice of appeal.
Preliminarily, we note that both parties agree that the 20 December 2005 order from which DSS appeals is an interlocutory order. They disagree, however, as to whether the "substantial right" exception applies in the instant case.
"`An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy.'" Davis v. Davis, 360 N.C. 518, 524, 631 S.E.2d 114, 119 (2006) (quoting Veazey v. City of Durham, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950)). "Generally, a party cannot immediately appeal from an interlocutory order unless failure to grant immediate review would `affect[] a substantial right' pursuant to [North Carolina General Statutes,] sections 1-277 and 7A-27(d)." Id. at 524, 631 S.E.2d at 119. "The burden is on the appellant to establish that a substantial right will be affected unless he is allowed immediate appeal from an interlocutory order." Embler v. Embler, 143 N.C.App. 162, 166, 545 S.E.2d 259, 262 (2001).
"The `substantial right' test for appealability of interlocutory orders is that `the right itself must be substantial and the deprivation of that . . . right must potentially work injury . . . if not corrected before appeal from final judgment.'" Frost v. Mazda Motor of Am., Inc., 353 N.C. 188, 192-93, 540 S.E.2d 324, 327 (2000) (quoting Goldston v. Am. Motors Corp., 326 N.C. 723, 726, 392 S.E.2d 735, 736 (1990)). Our Supreme Court has "adopted the dictionary definition of `substantial right': `a legal right affecting or involving a matter of substance as distinguished from matters of form: a right materially affecting those interests which a [person] is entitled to have preserved and protected by law: a material right.'" Sharpe v. Worland, 351 N.C. 159, 162, 522 S.E.2d 577, 579 (1999) (alteration in original) (quoting Oestreicher v. Am. Nat'l Stores, Inc., 290 N.C. 118, 130, 225 S.E.2d 797, 805 (1976)).
Here, the right is one of substance as opposed to form. First, the trial court's order required DSS to pay (1) $2,800.00 to Habitat for Humanity to bring the Habitat mortgage to current status and (2) $1,000.00 toward repairs of the Habitat home. Although this Court has held that an injunction on the use of funds may not rise to the level of a substantial right, see Guy v. Guy, 27 N.C.App. 343, 348, 219 S.E.2d 291, 295 (1975), a substantial right may be affected when a trial court orders the immediate payment of funds. See, e.g., Harrell v. Harrell, 253 N.C. 758, 761, 117 S.E.2d 728, 731 (1961); Miller v. Henderson, 71 N.C.App. 366, 368, 322 S.E.2d 594, 596 (1984); see also State ex rel. Comm'r of Ins. v. N.C. Rate Bureau, 102 *270 N.C.App. 809, 811-12, 403 S.E.2d 597, 599 (1991) (holding that an order denying the release of funds held in escrow, as opposed to an order "purport[ing] to determine who is entitled to the money," is interlocutory and does not affect a substantial right). However, this Court also has held that "no substantial right exists . . . [w]hen the sole issue is the payment of money pending the litigation." Perry v. N.C. Dep't of Corr., 176 N.C.App. 123, 130, 625 S.E.2d 790, 795 (2006) (emphasis added). Nevertheless, the instant case affects more than just money; it also affects DSS's right to choose how to dispose of funds that it receives in its capacity as a representative payee properly designated by the Social Security Administration. Its right to use its discretion as representative payee is "a matter of substance as distinguished from [a] matter[] of form." Oestreicher, 290 N.C. at 130, 225 S.E.2d at 805. Accordingly, the trial court's order affects a substantial right.
After determining that the trial court's order affects a substantial right, we next must determine whether that right will be "lost absent immediate review." McCutchen v. McCutchen, 360 N.C. 280, 282, 624 S.E.2d 620, 623 (2006). In the case sub judice, the substantial right at issue will be lost if the trial court's order is not immediately reviewed. As DSS correctly contends in its brief, "[i]f DSS is not allowed to appeal until after the juvenile reaches majority age, DSS will never be able to recover the funds it was . . . required to pay pursuant to the Order." Specifically, DSS accurately notes that it "cannot sue the juvenile, because . . . he is not legally responsible for his own foster care costs. Neither can DSS sue the Guardian Ad Litem, because he or she only represents the juvenile and has not spent the money for its own purposes." Accordingly, as the trial court's 20 December 2005 order affects a substantial right that will be lost if not reviewed before final judgment, the instant appeal is properly before this Court.
On appeal, DSS contends that the trial court: (1) lacked authority to order DSS to use J.G.'s Social Security benefits to pay the repair costs as well as the delinquent, current, and future mortgage payments on the Habitat home; (2) erred in concluding that DSS is the general guardian of J.G.; and (3) erred in its finding of fact speculating on the impact that might have resulted if both Gibson had been promptly served with the child support complaint and the court had been informed that she was receiving a $500.00 adoption subsidy for J.G., on the grounds that this finding was not supported by competent evidence in the record.
As a preliminary matter, we agree with the guardian ad litem that a resolution of DSS's second and third arguments is not necessary for a resolution of the instant appeal. Notwithstanding the trial court's finding that DSS functioned as J.G.'s general guardian and that, had DSS acted more diligently, Gibson may have been ordered to pay her adoption subsidy money toward J.G.'s cost of care, the trial court nevertheless ordered DSS in its capacity as J.G.'s representative payee to make payments on the Habitat mortgage on J.G.'s behalf. Specifically, the trial court "ordered that the Guilford County Department of Social Services is to use funds from [J.G.]'s social security benefits, for which the Department is representative payee, to pay the monthly mortgage on [J.G.]'s Habitat house. . . ." (Emphasis added). The pivotal issue on appeal is not whether the trial court erred in its findings with respect to guardianship or Gibson's adoption subsidy, but rather whether the trial court properly ordered DSS, as the representative payee of J.G.'s Social Security benefits, to make the payments on J.G.'s Habitat mortgage. Because a resolution of DSS's second and third arguments is not necessary for our resolution of the appeal, we decline to reach those issues. See, e.g., Champs Convenience Stores, Inc. v. United Chem. Co., Inc., 329 N.C. 446, 452, 406 S.E.2d 856, 859 (1991); State ex rel. Utils. Comm'n. v. S. Bell Tel. & Tel. Co., 326 N.C. 522, 528, 391 S.E.2d 487, 490 (1990).
First, DSS contends that because federal law governs Social Security benefits, North Carolina state courts are preempted and therefore lack subject matter jurisdiction to enter orders affecting such benefits. We disagree.
*271 "Federal preemption occurs when the federal government's regulation in an area is comprehensive. State action may be barred upon a showing of congressional intent to occupy the field and prohibit parallel state action." Hatcher v. Harrah's N.C. Casino Co., L.L.C., 151 N.C.App. 275, 278, 565 S.E.2d 241, 243 (2002) (internal quotation marks and citations omitted). However, as the United States Supreme Court has explained,
[w]e start with the premise that nothing in the concept of our federal system prevents state courts from enforcing rights created by federal law. Concurrent jurisdiction has been a common phenomenon in our judicial history, and exclusive federal court jurisdiction over cases arising under federal law has been the exception rather than the rule.
Charles Dowd Box Co., Inc. v. Courtney, 368 U.S. 502, 507-08, 82 S.Ct. 519, 523, 7 L.Ed.2d 483, 487 (1962).
Title 42 of the United States Code, as well as the regulations promulgated thereunder by the Social Security Administration, governs Social Security benefits. See 42 U.S.C. §§ 401 et seq.; 20 C.F.R. §§ 401.5 et seq. Pursuant to Title 42, section 405, "misuse of benefits by a representative payee occurs in any case in which the representative payee receives payment under this title for the use and benefit of another person and converts such payment, or any part thereof, to a use other than for the use and benefit of such other person." 42 U.S.C. § 405(j)(9). The statute further provides that "[t]he Commissioner of Social Security may prescribe by regulation the meaning of the term `use and benefit' for purposes of this paragraph." Id. The Social Security regulations, in turn, state that "payments . . . to a representative payee have been used for the use and benefit of the beneficiary if they are used for the beneficiary's current maintenance. Current maintenance includes cost[s] incurred in obtaining food, shelter, clothing, medical care, and personal comfort items." 20 C.F.R. §§ 404.2040, 416.640.
In the instant case, DSS has been appointed representative payee of J.G.'s Social Security payments, and in that capacity, DSS has reimbursed itself for the cost of J.G.'s foster care. As such, DSS contends that it is using, and always has used, J.G.'s Social Security benefits for his "current maintenance" as defined by the federal regulations.
Notwithstanding mixed reviews,[2] DSS's actions in the instant case have become a common practice by foster care agencies throughout the country:
As a part of revenue maximization strategies . . ., foster care agencies are engaged in the systemic practice of converting foster children's Social Security benefits into a source of state funds. The agencies identify foster children who are disabled or have deceased or disabled parents, apply for Social Security benefits on the children's behalf, and then take the children's benefits to reimburse foster care costs for which the children have no legal obligation. The states are using the Social Security benefits as a funding stream in order to reduce state expenditures rather than as a resource to address the children's unmet needs in the severely broken foster care system. Furthermore, the benefits are not being conserved to aid the children in their forthcoming and difficult transitions from foster care to independence.
Daniel L. Hatcher, Foster Children Paying for Foster Care, 27 Cardozo L.Rev. 1797, 1798-99 (2006) (footnotes omitted). Nevertheless, the United States Supreme Court upheld such a practice in Washington State Dep't of Social & Health Services v. Guardianship *272 Estate of Keffeler, 537 U.S. 371, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003). Specifically, the Keffeler Court addressed whether a foster care agency's practice of reimbursing itself violated the anti-alienability provision in the Social Security Act. See Keffeler, 537 U.S. at 375, 123 S.Ct. at 1020, 154 L.Ed.2d at 979 ("The question here is whether the State's use of Social Security benefits to reimburse itself for some of its initial expenditures violates a provision of the Social Security Act protecting benefits from `execution, levy, attachment, garnishment, or other legal process.' We hold that it does not." (internal citations omitted)). The issue in Keffeler was narrow, however,[3] and Keffeler alone does not support DSS's preemption argument.
Although this Court has held that a trial court does not have jurisdiction to direct the Social Security Administration to make payments to someone other than the beneficiary or representative payee, see Brevard v. Brevard, 74 N.C.App. 484, 488, 328 S.E.2d 789, 792 (1985),[4] we note that "[t]he SSA [Social Security Administration] does not resolve disputes between a payee and a beneficiary concerning the use of benefits." Jahnke v. Jahnke, 526 N.W.2d 159, 163 (Iowa 1994). As a result, several courts have held that state courts have concurrent jurisdiction to hear disputes between a representative payee and a beneficiary concerning the use of Social Security funds. See, e.g., id. ("Although the federal government may prosecute a payee who converts a beneficiary's funds, there is no federal mechanism to prevent such a conversion from occurring. Moreover, once the SSA pays the benefits to the proper representative payee, it has no liability to the beneficiary for misuse of the payments."); Ecolono v. Div. of Reimbursements, 137 Md.App. 639, 769 A.2d 296, 305 (2001) ("[W]e find nothing in federal law to indicate an intent by Congress to limit interested parties to the federal administrative and judicial review process and to prohibit State courts from exercising jurisdiction, in the case before us, when the relief requested is not the removal of the payee but a reallocation of the benefits."); In re Kummer, 93 A.D.2d 135, 159, 461 N.Y.S.2d 845 (N.Y.App. Div.1983) ("[T]he Federal Government has no interest in the funds properly paid to the DSS and it has no power to inquire into their expenditure other than to ascertain whether to make future payments to the DSS as representative payee. It lacks the power to determine disputes between the representative payee and the beneficiary as to the propriety of expenditures of benefits held in trust by the former because it has no interest in those funds." (footnotes omitted)); Catlett v. Catlett, 55 Ohio App.3d 1, 561 N.E.2d 948, *273 953 (1988) ("We find that the case at bar involves an issue, i.e., the representative payee's expenditure of benefits, which is neither an initial determination nor a determination which is not an initial determination as defined by the federal regulations. Jurisdiction over this particular issue has not been exclusively granted to the federal courts by express provision."). But see Deweese v. Crawford, 520 S.W.2d 522, 526 (Tex.Ct.App.1975) (holding that any dispute between parents and payee as to use of dependent's Social Security benefits must be resolved through federal administrative process), overruled on other grounds by Cherne Indus., Inc. v. Magallanes, 763 S.W.2d 768, 772 (Tex.1989).
In Jahnke v. Jahnke, the Iowa Supreme Court, in determining that the state court possessed concurrent jurisdiction in a dispute between a representative payee and an adoptive parent of the beneficiary, noted that "[t]he assumption of state court jurisdiction is based in part on the state's interest in the welfare of children residing within its borders." Jahnke, 526 N.W.2d at 163 (emphasis added). Similarly, in the instant case, the guardian ad litem, acting on behalf of J.G., disputed DSS's use of J.G.'s Social Security funds, and the trial court found that DSS's use of the funds was not in J.G.'s best interests. Under our Juvenile Code,
[t]he duties of the guardian ad litem program shall be to make an investigation to determine the facts, the needs of the juvenile, and the available resources within the family and community to meet those needs; . . . to report to the court when the needs of the juvenile are not being met; and to protect and promote the best interests of the juvenile until formally relieved of the responsibility by the court.
N.C. Gen.Stat. § 7B-601 (2005). Additionally, "[i]t is the duty of the court to give each child before it such attention, control and oversight as is in the best interest of the child and the state." In re Cusson, 43 N.C.App. 333, 337, 258 S.E.2d 858, 860 (1979) (emphasis added) (citing In re Eldridge, 9 N.C.App. 723, 724, 177 S.E.2d 313, 313 (1970)). Here, both the guardian ad litem and the trial court acted consistently with their supervisory roles in seeing to J.G.'s best interests, and J.G.'s best interests were central to the court's order, which noted that if Habitat for Humanity foreclosed on the Habitat home, J.G. would receive very little money from the sale and would be homeless when he aged out of foster care. See generally Michele Benedetto, An Ounce of Prevention: A Foster Youth's Substantive Due Process Right to Proper Preparation for Emancipation, 9 U.C. Davis J. Juv. L. & Pol'y 381, 386-89 (2005) (discussing the troubling prevalence of homelessness among former foster care youth). Although DSS implies that it is always proper for it to reimburse itself for the cost of J.G.'s care using J.G.'s Social Security funds, even the Department of Social and Health Services in Keffeler acknowledged that it was not always appropriate to use all of a juvenile's Social Security funds to reimburse itself, in particular in anticipation of "impending emancipation." Keffeler, 537 U.S. at 378-79, 123 S.Ct. at 1022, 154 L.Ed.2d at 981-82 ("The department occasionally departs from this practice, . . . [a]nd there have . . . been exceptional instances in which the department has foregone reimbursement for foster care to conserve a child's resources for expenses anticipated on impending emancipation.").
In accordance with the greater weight of authority, "[w]e agree with those courts that allow state courts to look into the expenditure of dependent social security benefits when an interested party questions the propriety of those expenditures." Jahnke, 526 N.W.2d at 163. Further, the trial court properly exercised jurisdiction as part of its supervisory role over J.G., a "child subject to its jurisdiction." Eldridge, 9 N.C.App. at 724, 177 S.E.2d at 313. Accordingly, DSS's assignment of error with respect to subject matter jurisdiction is overruled.
DSS next contends that the trial court's order violated the anti-alienability provision of the Social Security Act, codified at section 407(a) of Title 42 of the United States Code. We disagree.
"In general, Social Security benefits are neither assignable nor subject to legal process." Brevard, 74 N.C.App. at 487, 328 S.E.2d at 791 (citing 42 U.S.C. § 407 and *274 Philpott v. Essex County Welfare Bd., 409 U.S. 413, 93 S.Ct. 590, 34 L.Ed.2d 608 (1973)). Specifically,
[t]he right of any person to any future payment under this title [42 U.S.C. §§ 401 et seq.] shall not be transferable or assignable, at law or in equity, and none of the moneys paid or payable or rights existing under this title shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

42 U.S.C. § 407(a) (emphases added). In the instant case, DSS contends that by entering the order directing DSS to make J.G.'s mortgage payments, the trial court subjected J.G.'s Social Security benefits to "legal process" in violation of Title 42, section 407(a) of the United States Code.
In Keffeler, the United States Supreme Court declined to provide a comprehensive definition of "other legal process" but explained that
"other legal process" should be understood to be process much like the processes of execution, levy, attachment, and garnishment, and at a minimum, would seem to require utilization of some judicial or quasi-judicial mechanism, though not necessarily an elaborate one, by which control over property passes from one person to another in order to discharge or secure discharge of an allegedly existing or anticipated liability.
Keffeler, 537 U.S. at 385, 123 S.Ct. at 1026, 154 L.Ed.2d at 985. Using the guidance set forth by the Supreme Court in Keffeler, we must determine whether the trial court's 20 December 2005 order constitutes "other legal process" with respect to the alienation of J.G.'s Social Security benefits.
In interpreting section 407(a), we first note that legislative intent controls the construction of a statute. See Fid. & Deposit Co. v. Arenz, 290 U.S. 66, 69, 54 S.Ct. 16, 78 L.Ed. 176, 178 (1933). As our Supreme Court has explained, "in ascertaining this [legislative] intent, a court must consider the act as a whole, weighing the language of the statute, its spirit, and that which the statute seeks to accomplish." Shelton v. Morehead Mem'l Hosp., 318 N.C. 76, 81-82, 347 S.E.2d 824, 828 (1986).
Although DSS in the case sub judice contends that the trial court's order directing DSS to make payments on the Habitat mortgage constitutes "legal process" and violates section 407(a), DSS's "interpretation of 42 U.S.C. § 407 takes the statute out of context and is an improper attempt to fashion a shield into a sword to be used against the intended beneficiary of the law." In re French, 20 B.R. 155, 156 (Bankr.D.Or.1982). It is well-settled that "Congress in enacting 42 U.S.C. § 407 sought to protect Social Security payments which benefit the poor and needy from seizure in legal process against the beneficiaries. Section 407 deals with the rights of social security recipients and seeks to protect their benefits from the reach of creditors." In re Greene, 27 B.R. 462, 464 (Bankr.E.D.Va.1983) (internal citation omitted); see also Lee v. Schweiker, 739 F.2d 870, 874 (3d Cir.1984) (noting that the purpose underlying section 407(a) "is to protect recipients from losing benefits to creditors"). As such, several state courts have discussed section 407(a) as a limitation upon creditors' rights, see, e.g., In re Estate of Vary, 401 Mich. 340, 258 N.W.2d 11, 17-18 (1977), cert. denied sub nom., Ivy v. Mich. Dep't of Treasury, 434 U.S. 1087, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978); First Nat'l Bank & Trust Co. v. Arles, 816 P.2d 537, 539 (Okla. 1991), and "[c]ourts have uniformly recognized that the purpose of section 407(a) is to protect social security beneficiaries and their dependents from the claims of creditors." Fetterusso v. New York, 898 F.2d 322, 327 (2d Cir.1990) (emphasis added) (citations omitted). Indeed, the anti-alienability provision "speaks throughout in terms of the rights of social security recipients . . . and the protection of their benefits from the reach of creditors." Rowan v. Morgan, 747 F.2d 1052, 1055 (6th Cir.1984) (third emphasis added) (quoting Neavear v. Schweiker, 674 F.2d 1201, 1205 (7th Cir.1982)). We note, however, that "`[Section] 407 does not refer to any "claim of creditors"; it imposes a broad bar against the use of any legal process to reach all Social Security benefits.'" Keffeler, 537 U.S. at 382, 123 S.Ct. at 1024, 154 L.Ed.2d at 985 (quoting Philpott, *275 409 U.S. at 417, 93 S.Ct. at 593, 34 L.Ed.2d at 611-12). Nevertheless, the focus of section 407(a) is to protect Social Security beneficiaries against claimants to Social Security benefits, whether or not such claimants are creditors. See Philpott, 409 U.S. at 417, 93 S.Ct. at 593, 34 L.Ed.2d at 612 (noting that section 407 "is broad enough to include all claimants, including a State"). The congressional intent that section 407(a) protect Social Security beneficiaries against actions brought against them is reflected further in the House Conference Report on the Supplemental Security Income legislation:
"[I]f the benefits which would be provided under this program are to meet the most basic needs of the poor, the benefits must be protected from seizure in legal processes against the beneficiary. Therefore, any amounts paid or payable under this program would not be subject to levy, garnishment, or other legal process, except the collection of delinquent Federal taxes. Also, entitlement to these benefits would not be transferable or assignable."
Kerlinsky v. Commonwealth, 17 Mass.App. Ct. 501, 459 N.E.2d 1240, 1241-42 (1984) (quoting 1972 U.S.C.C.A.N. 5142) (emphasis added). Therefore, we hold that the anti-alienability provision functions as a bar against actions for Social Security benefits brought against Social Security beneficiaries and payees. See Metz v. Metz, 120 Nev. 786, 101 P.3d 779, 784 (2004) ("Under 42 U.S.C. § 407, Congress has expressly exempted all Social Security benefits from legal process brought by any creditor, including attachment, garnishment, levy or execution. . . ." (emphasis added)); see also Commonwealth ex rel. Morris v. Morris, 984 S.W.2d 840, 841 (Ky.1998) ("The patent intent of this statute is to prohibit creditors from asserting claims upon SSI funds that take precedence over the SSI recipient's rights to such funds." (emphasis added)).
This holding comports with the statutory language as well as the Supreme Court's decision in Keffeler. The statute provides that Social Security funds "shall [not] be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law." 42 U.S.C. § 407(a). The Keffeler Court further noted that "`other legal process' should be understood to be process much like the processes of execution, levy, attachment, and garnishment." Keffeler, 537 U.S. at 385, 123 S.Ct. at 1026, 154 L.Ed.2d at 985. "These legal terms of art refer to formal procedures by which one person gains a degree of control over property otherwise subject to the control of another, and generally involve some form of judicial authorization." Id. at 383, 123 S.Ct at 1025, 154 L.Ed.2d at 984. In the instant case, no other person or entity gained control over J.G.'s funds; DSS continued, as representative payee, to control the funds, but merely was directed by the court in its supervisory role to use a portion of the funds to keep J.G.'s mortgage current  an action intended for the direct benefit of J.G.
Furthermore, the actions listed in section 407(a) typically are brought by creditors or other claimants. See, e.g., Black's Law Dictionary 609 (8th ed.2004) (defining "execution" as the "[j]udicial enforcement of a money judgment, [usually] by seizing and selling the judgment debtor's property"); id. at 926 (defining "levy" as the taking or seizing of "property in execution of a judgment" and providing as an example the phrase, "the judgment creditor may levy on the debtor's assets"); id. at 136 (defining "attachment" as a "the seizing of a person's property to secure a judgment or to be sold in satisfaction of a judgment"); id. at 702 (defining "garnishment" as "[a] judicial proceeding in which a creditor (or potential creditor) asks the court to order a third party who is indebted to or is bailee for the debtor to turn over to the creditor any of the debtor's property (such as wages or bank accounts) held by that third party").[5] Here, there is no creditor, nor is there any claimant.
In the case sub judice, the guardian ad litem filed a motion to protect J.G.'s reasonably foreseeable needs, and based upon this motion, the trial court entered its order directing DSS, inter alia, to use a portion of *276 J.G.'s Social Security benefits to keep current the mortgage on the Habitat home. As discussed supra, the legislative intent underlying section 407(a) is to protect Social Security beneficiaries from actions brought by creditors or other claimants. Such was not the case here, and therefore, section 407(a) is inapplicable.[6] Accordingly, DSS's assignment of error is overruled.
Affirmed.
Judges CALABRIA and GEER concur.
NOTES
[1] Since no mortgage payment was made since January 2005, the past-due amount of $2,800.00 accumulated while J.G. was in DSS custody.
[2] See, e.g., Patrick Gardner, Keffeler v. DSHS: Picking the Pockets of America's Neediest Children, Youth L. News, July-Sept.2002; Lorraine Ahearn, At Eleventh Hour, Judge Saves Boy in Foreclosure, Greensboro News & Rec., Dec. 18, 2005 (describing J.G.'s situation as "a story of uncommon cruelty, compounded by layer upon layer of bureaucratic incompetence: And finally, no remorse from the only parent the boy, at age 15, has left  the Department of Social Services."). But see Tobias J. Kammer, Note, Keffeler v. Department of Social and Health Services: How the Supreme Court of Washington Mistook Caring for Children as Robbing Them Blind, 77 Wash. L.Rev. 877, 878 (2002) (arguing that social services entities "will not apply to act as representative payee if not permitted to use benefits for the child's current maintenance due to the application expenses").
[3] We note that there may be viable constitutional objections to the practice employed by DSS in the instant case and used by similar state agencies throughout the country. See generally Hatcher, supra, at 1832-41 (discussing possible objections based upon procedural due process, equal protection, and the Takings Clause). The Keffeler Court acknowledged the existence of a procedural due process claim but declined to rule upon the issue. See Keffeler, 537 U.S. at 380 n. 4, 123 S.Ct. at 1023 n. 4, 154 L.Ed.2d at 982 (declining to reach the issue because the Washington Supreme Court did not reach the argument, "accepted in the alternative by the trial court, that the department violated procedural due process by failing to provide notice of the `intended result' of its appointment as representative, payee"). However, because such constitutional arguments were not raised at trial, we do not pass upon them on appeal. See State v. Deese, 136 N.C.App. 413, 420, 524 S.E.2d 381, 386 (holding that this Court will not consider constitutional arguments neither asserted nor determined in the trial court), appeal dismissed and disc. rev. denied, 351 N.C. 476, 543 S.E.2d 499 (2000).
[4] Although the Brevard Court also held that the trial court had no jurisdiction to order the representative payee, who was the father of the beneficiaries, to pay over to the mother of the beneficiaries any part of the Social Security benefits he received as representative payee, the holding was based upon Title 42, section 407(a) of the United States Code. See Brevard, 74 N.C.App. at 487-88, 328 S.E.2d at 792 (citing 42 U.S.C. § 407(a)). As discussed infra, however, section 407(a) applies only to actions brought by claimants or creditors. In Brevard, the action was brought by the mother for an accounting of the Social Security benefits, based upon a prior trial court order directing the father to send the children's Social Security checks to the mother as child support. See id. at 486, 328 S.E.2d at 791. The case sub judice is distinguishable as the action was brought by the guardian ad litem and not a claimant to the Social Security benefits. Therefore, the trial court here, unlike the court in Brevard, did not violate section 407(a).
[5] See Keffeler, 537 U.S. at 383, 123 S.Ct. at 1025, 154 L.Ed.2d at 984-85 (using legal dictionary definitions for "garnishment" and "attachment").
[6] Several courts have explained that because section 407(a) functions as a protection for Social Security beneficiaries, beneficiaries may waive that statutory protection. See, e.g., In re Gillespie, 41 B.R. 810, 812 (Bankr.D.Colo.1984) (noting that a debtor may waive the protections afforded him by section 407(a)); Matavich v. Budak, 4 Ohio App.3d 228, 447 N.E.2d 1311, 1312-13 (1982) (same). Because we hold that section 407(a) does not apply, we need not decide whether section 407(a) may be waived.