2013 VT 21

## Christine LaMothe v. Christopher LeBlanc

[70 A.3d 977]

No. 11-292

Present: Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.

Opinion Filed March 15, 2013

400

*Priscilla B. Dubé* and *Adam P. Bergeron* of *Bergeron, Paradis & Fitzpatrick, LLP*, Burlington, for Plaintiff-Appellee.

*Christopher L. LeBlanc*, Pro Se, Williston, Defendant-Appellant.

¶ 1. **Robinson, J.** Father appeals an order of the superior court's family division upholding the magistrate's denial of his motion to modify his child support obligation. In particular, father argues that the magistrate erred in declining to impute income to mother, and that the magistrate failed to properly apply a credit in his favor to account for derivative benefits paid directly to mother on behalf of the minor child by the Social Security Administration on account of father's disability. We reverse.

¶ 2. Father and mother are the parents of a minor child born in January 2000. In 2006, by stipulation of the parties in this

parentage action, the family court assigned physical rights and responsibilities to mother, who had been the sole custodial parent prior to that stipulation, and increased father's parent-child contact to include every other Tuesday to Monday during the school year. During the summer, the minor child was to spend fifty percent of his time with each parent. Because the new order contemplated that the minor child would spend well over thirty percent of nights with father, the parties stipulated to a new child support order pursuant to the shared custody guidelines. The child support order obligated father to pay $175 per month, and obligated the parties to split equally all unreimbursed health-related expenses, including dental.

¶ 3. In November 2008, because father was unable to work due to severe injuries he suffered in a motor vehicle accident, the family court issued a modified child support order that did not require either party to pay child support. The order reflected that upon father's return to full-time employment, child support payments, calculated pursuant to the guidelines, would resume. The parties remained obligated pursuant to that order to split unreimbursed health-related expenses equally.

¶ 4. In December 2010, father filed a pro se motion to modify child support by establishing an order requiring mother to pay him child support. Father represented that he had begun receiving Social Security Disability (SSDI) benefits, and that the minor child had begun receiving derivative benefits on account of father's disability. In his motion, father raised three issues. First, he represented that the Social Security Administration (SSA) was sending the $190/month derivative benefit for the minor child directly to mother, and he essentially argued that he should receive some benefit in the determination of his child support obligation on account of that payment. Second, he explained that the SSA mailed the initial derivative benefit check for the minor child, which included accumulated benefits in the amount of $4370, to mother; he argued that this lump sum payment should be credited toward his share of the $5780 uninsured dental bill for the minor child's braces. Third, he asked the magistrate to take mother's voluntary underemployment into account in fashioning a new child support order.

¶ 5. In a March 2011 order, the magistrate denied father's motion. With respect to the monthly child support obligation, the magistrate made the following relevant findings: (1) The parties

shared physical rights and responsibilities for the minor child based upon an approximate overnight schedule of fifty-three percent with mother and forty-seven percent with father;[1] (2) father received $1035 per month in direct SSDI benefits; (3) in addition to the minor child that is the subject of this parentage action, father has two other minor children; (4) mother resides with two other minor children in addition to the minor child that is the subject of this parentage action; (5) mother collected $1026 in monthly unemployment benefits, earned approximately sixty dollars per week tending bar, and received $700 per month in child support on account of her other two children; (6) the $190 monthly derivative SSDI benefit for the minor child on account of father's disability was paid directly from the SSA to mother on account of her status as the primary custodial parent.[2] None of these facts are in dispute.

¶ 6. The magistrate did not impute additional income to mother, and did not make any findings relating to this determination.

¶ 7. The magistrate noted that father operated a business that had generated more than $50,000 in gross receipts in 2008 and 2009, but with respect to which father's tax return showed a net loss in each year. The court stated that it assumed that father did not continue to operate that business without some financial benefit, despite the losses reflected on paper, but did not make any finding that the business generated income to father, and did not impute any additional income to father on account of this business.

¶ 8. Recognizing that the court was powerless to order SSA to divide the derivative benefit between the parents or send it to father rather than mother, the magistrate explained that this Court's decision in *Cantin v. Young*, 171 Vt. 659, 662, 770 A.2d 449, 452 (2000) (mem.), provided the framework for considering the derivative payment in the child-support-guidelines calculation: first,

---

[1] As set forth more fully below, for child support purposes, the magistrate properly described the parties as sharing physical rights and responsibilities. See 15 V.S.A. § 657(a) (shared custody calculation applies when "each parent exercises physical custody for 30 percent or more of a calendar year"). With respect to parental rights and responsibilities, mother continued to exercise sole physical rights and responsibilities.

[2] In its opinion, the court at one point stated that the monthly derivative benefit for the minor child is $195; at another, it uses the $190 figure. A review of the record confirms that $190 is the correct and uncontested amount.

the court would consider the derivative benefit as income to father; then it would treat the benefit as a child support payment from father to mother. Purportedly applying this methodology, the magistrate concluded that a guidelines calculation "would result in a nominal obligation from father to mother after including the derivative benefit." Given the nominal obligation, the trial court opted to keep the zero child support order in place. It further noted that neither party had the current ability to pay support to the other.

¶ 9. With respect to the lump sum accumulated derivative benefit of $4370 that had been paid directly to mother, the magistrate declined to credit father for that sum, explaining that mother's receipt of the lump sum did not alter the parties' respective obligations to pay half the cost of uninsured medical and dental costs.

¶ 10. Father appealed to the family division, which upheld the magistrate's decision. Concerning father's request that the magistrate impute income to mother on account of voluntary underemployment, the family division noted that imputation of additional income would only be appropriate if the magistrate found that mother, who testified that she had been laid off and was looking for work, was *voluntarily* underemployed. Reviewing the record, the family division affirmed that the magistrate did not err in failing to make such a finding.

¶ 11. With respect to the SSDI derivative benefit, the family division stated, "The court has been unable to find any case law from other states authorizing a trial court to divide among parents the monthly SSA derivative benefits received by the custodial parent." Accordingly, the family division affirmed on this point. Likewise, the family division concluded that the magistrate's order denying father's request to split the lump sum arrearage payment was not erroneous. Father timely appealed.

I.

■ ■ ¶ 12. Before considering the magistrate's calculation of ongoing child support in light of the derivative benefit, we address the dissent's suggestion that this issue is not before this Court because it was not raised below. *Post*, ¶¶ 44-53. The magistrate's decision reflects that father, representing himself, was "seeking an order that he receive a portion of [the minor child's] ongoing derivative benefit." The superior court's order on appeal recites father's argument that the "Family Court needs to order an equitable means of distributing the benefit ($190/month) to ac-

count for support the child [sic] when he is with disabled parent 47% of the time, and with his able-bodied parent 53% of the time." That court further noted that father's legal argument for appeal "boils down to two points." The first of those points was father's claim that "he is entitled to some of the SSA derivative benefit . . . which mother receives directly from the SSA." Like the magistrate, the superior court on appeal squarely considered not only its authority, or lack thereof, to "divide up" the derivative benefit, but it analyzed and ruled on the application of the child support guidelines to these facts in light of our decision in *Cantin*. 171 Vt. 659, 770 A.2d 449. This latter question, which is the central issue in father's brief, is squarely before us given this record. The suggestion that because father initially framed his argument below as one to "divide the benefit" we cannot consider the proper application of the child support guidelines to these facts ignores the thrust of unrepresented father's arguments below, as well as the reality that both lower courts squarely addressed the argument presented on appeal. See *Rutland Herald v. Vt. State Police*, 2012 VT 24, ¶¶ 33-34, 191 Vt. 357, 49 A.3d 91 (acknowledging that party could have made its constitutional arguments "more pointedly" in trial court, but holding that issues were preserved because briefing made it sufficiently clear that party argued that applicable statute should be construed in light of constitutional considerations); *Bradford Oil Co. v. Stonington Ins. Co.*, 2011 VT 108, ¶ 22, 190 Vt. 330, 54 A.3d 983 ("Preservation requires a party to present the issue with specificity and clarity at the trial court *in order to ensure that the original forum is given an opportunity to rule on an issue prior to review by this Court.*" (emphasis added) (quotations omitted)); see also *Sandgate Sch. Dist. v. Cate*, 2005 VT 88, ¶ 9, 178 Vt. 625, 883 A.2d 774 (mem.) (acknowledging "wider leeway" traditionally accorded pro se litigants).

¶ 13. The dissent also contends that the magistrate's order and the superior court's affirmance were predicated on a "deviation" from the child support guidelines, presumably pursuant to 15 V.S.A. § 659, such that the underlying child-support-guidelines calculation is irrelevant. *Post*, ¶¶ 45-51. The suggestion that even if the magistrate's initial guidelines calculation was substantially wrong, its purported decision to deviate insulates that calculation from review is puzzling. The guidelines calculation is presumed to reflect the amount of child support needed, 15 V.S.A. §§ 655,

659(a), and is unquestionably an important factor in the overall child support order even in the case of an order deviating from the guidelines. See *id.* § 659(a) (deviation reflects adjustment of child support from guidelines amount). It is not a bursting bubble that ceases to have significance once a court deviates. If the magistrate had issued a new child support order in this case, and its findings reflected that it had done so believing itself to be deviating by $26 per month from the presumptively appropriate level of support calculated pursuant to the guidelines, the fact that the magistrate deviated from the guidelines would not preclude us from reviewing a substantial legal error in its underlying guidelines calculation.

¶ 14. In any event, the dissent's argument misapprehends the record, as well as the procedural posture of the magistrate's order. The magistrate did not enter a new child support order — with or without a deviation; rather, the magistrate denied father's motion to modify an already-existing zero-support order.

¶ 15. If the argument is that the court's decision to deny father's request to modify the existing child support order was based on the magistrate's determination that any new child support order would reflect a deviation from the guidelines calculation to a zero-support order, this theory finds scant support in the record. The term "deviation" does not appear anywhere in the magistrate's decision or in the superior court's six-page opinion on appeal. The superior court accurately describes that the magistrate "found that the guideline would result in a 'nominal' obligation from father to mother after including the derivative benefit, and therefore concluded the zero support order should remain in place." Accordingly, the superior court reviewed and reaffirmed the application of *Cantin* to the child-support-guidelines calculation performed by the magistrate.

¶ 16. The dissent suggests that because the magistrate did not issue an order for the guidelines amount — albeit nominal given the way the magistrate did the calculation — its child support order *must have* reflected a deviation. But the magistrate did not issue a child support order at all; it denied father's motion to modify. See 15 V.S.A. § 660(a)(1) (child support order may be modified upon showing of real, substantial and unanticipated change of circumstances). Had the magistrate intended to issue a child support order reflecting a deviation, it would have issued a child support order reflecting the guidelines calculation and the

court's decision to deviate. Having concluded that the guidelines calculation would require only nominal support from father to mother, the magistrate denied the motion to modify outright.

■ ¶ 17. Moreover, the opinions below do not contain any of the hallmarks of a deviation analysis.[3] As we have noted, "Section 659(a) [of Title 15] creates a rebuttable presumption that the amount reflected in the child-support guidelines is the amount of support needed by the children." *Tetreault v. Coon*, 167 Vt. 396, 405, 708 A.2d 571, 578 (1998). In order to deviate from the guideline amount in a child support order, a court must make a finding that application of the guidelines would be unfair. *Id.* In making that finding, "the court must consider all of the relevant factors, including the nine factors specified in the statute. See 15 V.S.A. § 659(a)". *Id.*; see also *Adamson v. Dodge*, 174 Vt. 311, 318-20, 816 A.2d 455, 462-63 (2002) (reversing child support award that departed from guidelines calculation where trial court failed to consider each factor listed in statute).

¶ 18. In fact, the record reflects that the trial court expressly deferred mother's request to present evidence in support of a deviation. At the end of the hearing before the magistrate, in the context of a discussion with counsel in which all present recognized that they did not yet know who would be the obligor under a guidelines calculation, and in response to mother's request to present evidence supporting a deviation in the event that mother was determined to be the obligor, the magistrate stated: "[I]f the court decides that there should be some child support obligation at least preliminarily owed by [mother], then the [c]ourt will set the matter over for a brief deviation hearing to hear any of the relevant evidence on that issue." Having concluded that, considering the derivative benefit as provided for in *Cantin*, father owed nominal child support to mother that did not warrant modification of the existing zero-support order, the court never got to the question of deviation.[4]

---

[3] The dissent suggests that we are ignoring a deviation-in-fact due to the magistrate's failure to say the "magic word." Our assessment is based on the substance of the magistrate's statements and actions and is reinforced by the superior court's clear understanding on appeal that the issue in this case was the application of the child support guidelines and not the propriety of a deviation.

[4] The dissent accurately points out that the magistrate noted from the bench at the close of the hearing that "this sounds like it's a request for a deviation from

■ ¶ 19. Accordingly, we consider the guidelines analysis upon which the magistrate's denial of father's motion to modify rested. The magistrate correctly recognized that our opinion in *Cantin* establishes the framework for calculating child support in cases in which a child is receiving SSDI derivative benefits on account of a parent. In that case, a noncustodial father received SSDI benefits, and the minor children received derivative benefits on his account. We endorsed a two-step process for taking the derivative benefit into account in the child-support-guidelines calculation. First, we reviewed the purposes of the child support statute — to "reflect the true costs of raising children and approximate insofar as possible the standard of living the child would have enjoyed had the marriage not been dissolved" — and held that the derivative benefits, although paid to the mother as representative payee, should be counted as part of the father's gross income in the child support calculation. *Cantin*, 171 Vt. at 662, 770 A.2d at 452. We explained that because the SSDI benefits received by the father and by his children were substitutes for the wages that the father would have earned had he not become disabled, declining to include the derivative benefit as part of the father's gross income would lead to "a failure to account for all of the income that would have been available to support the children had the family remained intact." *Id.* (quotation omitted).

■ ¶ 20. Second, we reaffirmed our holding in a pre-guidelines decision in which we held that an obligor parent is generally entitled to a credit toward a child support obligation for the disability payments received directly by the children. *Id.* (citing *Davis v. Davis*, 141 Vt. 398, 449 A.2d 947 (1982)). In *Davis*, we acknowledged that the derivative benefits for the minor children paid to the custodial parent on account of the noncustodial parent were, "in a sense, a substitute for wages the obligor would have received but for the disability, and from which the court ordered payments would otherwise have been made." 141 Vt. at 401, 449 A.2d at 948. We thus held that such payments should be treated as a credit toward the obligor's child support obligation *unless* the child support payments ordered were to be *in addition* to the government benefits.

---

the guideline." *Post*, ¶ 47. But, as reflected by the magistrate's written opinion, and consistent with the magistrate's statement of intent at the end of the hearing, the magistrate did not reach the deviation issue because it denied father's motion on the basis of its guidelines calculation.

¶ 21. Likewise, in *Cantin*, we specifically noted the logical consistency in treating the derivative payments as *both* income to the obligor father *and* as a credit toward his child support obligation. 171 Vt. at 662, 770 A.2d at 452. Although the SSA sent the derivative payment directly to the mother as representative payee, we endorsed a guidelines calculation predicated on a construct that viewed the funds as having been essentially "earned by" the obligor father and then paid to the custodial mother as child support. We reaffirmed this approach more recently in *Louko v. McDonald*, 2011 VT 33, 189 Vt. 426, 22 A.3d 433.

¶ 22. In light of these decisions, the family division's conclusion that the magistrate lacked the authority to "split the derivative benefit" misses the central issue. The magistrate recognized that the Vermont courts do not have the authority to order the SSA to divert a portion of the derivative benefit to father, but also properly understood that the real question before the court was how to account for the fact of the derivative benefit in the child support calculation — a matter squarely within the court's authority. The magistrate properly recognized that the framework we endorsed in *Cantin* applied.[5]

¶ 23. Although the magistrate properly invoked the methodology that we described in *Cantin*, it did not complete the *Cantin* analysis. The magistrate conducted the first step of the guidelines analysis properly, imputing the derivative benefit to father and calculating a child support obligation accordingly.[6] The magistrate's observation that the resultant child support obligation was nominal is correct.[7] However, the magistrate stopped the analysis

---

[5] The dissent asserts that the result in *Cantin* "is not commanded by our child support statute" and argues that the approach outlined therein affords a financial advantage of some sort to the parent on SSDI. *Post*, ¶¶ 55-57. It is not clear whether the dissent advocates abrogating *Cantin* and adopting a different approach. We accept the framework of *Cantin* as established law and, more importantly, as a well-reasoned methodology for accounting for derivative SSDI benefits.

[6] The child-support-calculation worksheet reflects a monthly income for father of $1225, representing $1035 per month in father's own SSDI benefit and $190 per month on account of the derivative benefit for the minor child.

[7] The magistrate apparently conducted two calculations. The only difference between the two was that one took into account each parent's two minor dependents in addition to the minor child that is the subject of this action (yielding a monthly child support obligation of $25), and one did not (yielding a monthly child support obligation of $16). The magistrate did not take into account the child

at that point, and never actually took the second step described in *Cantin* of applying the $190 as a payment from father to mother as a credit toward his child support obligation. Had it done so, it would have found that mother owed father a substantial monthly child support obligation on account of the imputed payment of child support from father to mother, by way of the derivative benefit, well in excess of the nominal child support obligation from father to mother pursuant to the guidelines calculation.[8]

¶ 24. Citing *Cantin*, mother argues that the court properly stopped after the first step; because the derivative benefit exceeded the monthly child support obligation from father to mother, she argues, the court properly reduced father's child support obligation to $0 rather than ordering mother to pay father back the excess. Mother's argument fundamentally misapprehends the distinction between child support calculations pursuant to the shared and sole custody guidelines.

¶ 25. Underlying the Vermont child support guidelines is the premise that children should receive the same proportion of parental income after separation or divorce of their parents as they would receive if their parents were living together in one household. 15 V.S.A. § 654. Accordingly, the first step in a child support calculation is to determine the "total support obligation" pursuant to the child support guidelines. 15 V.S.A. § 655. This figure is derived from the parties' respective available incomes, child care costs, and extraordinary expenses. 15 V.S.A. § 653(9). The guidelines developed by the Secretary of Human Services are supposed to reflect the percent of combined available income that parents living in the same household in Vermont ordinarily spend on their children. 15 V.S.A. § 654. Pursuant to the sole custody guidelines calculation, the total support obligation is divided between the parents in proportion to their respective available incomes, and then "the noncustodial parent shall be ordered to

---

support mother received for the benefit of those other two dependent children, but did take into account her unemployment benefits and her bartending wages. Because the magistrate characterized the child support obligation from father to mother as nominal, it did not specify which worksheet formed the basis for its conclusion. Because no party has raised the issue, we do not address the question of whether and how to account for mother's additional dependents and the child support she receives on account thereof in the child-support-guidelines calculation.

[8] Because the magistrate did two child-support-guidelines calculations and did not identify which one it applied, the imputed overpayment to mother could be either $165 or $174 per month. See *supra*, ¶ 23 n.7.

pay, in money, his or her share of the total support obligation to the custodial parent." 15 V.S.A. § 656(a). The custodial parent is presumed to spend his or her share of the total support obligation directly on the child. *Id.* The court may deviate from this guidelines child support calculation upon consideration of various factors if the court finds that application of the guidelines is unfair to the child or any of the parties. 15 V.S.A. § 659.

¶ 26. The structure of the shared custody guidelines calculation, which applies when each parent exercises physical custody for thirty percent or more of a calendar year, is completely different. First, in contrast to the sole custody guidelines calculation, which is designed to ensure that the custodial parent receives ample support to maintain the requisite standard of living for the minor children, the shared custody guidelines calculation concerns itself with maintaining *two* households, without distinction between custodial and noncustodial. 15 V.S.A. § 657(a) (total support obligation that forms basis for calculation of child support obligation is increased by fifty percent "to reflect the additional costs of maintaining two households").

¶ 27. This distinction is critical. The sole custody guidelines are premised on the assumption that the only parent maintaining a household for and meeting the child's needs is the custodial parent, so that the noncustodial parent meets his or her obligation of support for the child by making support payments to the custodial parent. In a shared-custody-child-support environment, *both* parents are presumed to be maintaining households and providing support for the child; neither is the presumed exclusive conduit for support to and for the child. As a consequence, in contrast to the sole custody guidelines calculation, the shared custody guidelines calculation makes no assumption concerning which parent is the obligor and which is the obligee. Instead,

> [e]ach parental support obligation shall be determined by dividing the total support obligation between the parents in proportion to their respective available incomes and in proportion to the amount of time each parent exercises physical custody. The parental support obligations shall then be offset, *with the parent owing the larger amount being required to pay the difference between the two amounts to the other parent.*

*Id.* (emphasis added). Pursuant to the shared custody guidelines calculation, the parent with whom the child spends more nights may well have an obligation to pay child support to the parent with whom the child spends fewer nights; in a situation in which a child is spending close to fifty percent of the time with each parent, and the parent with whom the child spends more nights has more available income than the other, this would not be a surprising outcome of a shared custody calculation.

¶ 28. We agree with mother and the dissent that if child support were calculated on a sole custody guidelines basis in this case, as it was in *Cantin*, the magistrate would not require the custodial parent to pay the noncustodial parent child support, notwithstanding a derivative benefit in excess of the noncustodial parent's child support obligation. See *Louko*, 2011 VT 33, ¶ 10. The statute governing the sole custody calculation clearly contemplates payment of child support by the noncustodial parent to the custodial parent and presumes that the custodial parent is the conduit for support for the child. To the extent that the excess benefit constitutes a "windfall" — money for support of the child in excess of that required by the Vermont child support guidelines — the child is entitled to the gratuity through the custodial parent. See *Keith v. Purvis*, 2007-CA-00495-COA, ¶ 12, 982 So. 2d 1033 (Miss. Ct. App. 2008) ("Social security benefits, to the extent that they exceed a non-custodial parent's monthly support obligation, are equitably deemed a gratuity to the child.").

¶ 29. But where child support is calculated pursuant to the shared custody guidelines — undisputedly the proper course here — neither parent is deemed to be "custodial" for the purposes of the basic guidelines calculation, neither is presumed to be the obligor, and *both* are presumed to require resources for the support of the child. As a consequence, the concept of an "excess benefit" does not apply, and the notion that the parent receiving SSDI benefits would realize an undue financial advantage from a calculation that recognized the payment to the other parent on account of the SSDI benefit parent's disability makes no sense. The guidelines are equally concerned with both parents' resources, and the calculation in this case allocates support so that each parent has, at his or her disposal, the resources required to support that child at the prescribed standard of living based on the amount of time the child spends with each parent and the parents' respective incomes — including the income imputed to

father on account of the derivative benefit. The child support determination here is not about what support father must pay to mother for her support of the child on their collective behalf, or vice versa; it is about whether and how much money is to be transferred from one to the other so that *each custodial parent* has the resources to support the child at a particular level.

¶ 30. If we do not apply the second step of the *Cantin* analysis — crediting father for the sums sent to mother on his account — mother will receive support for the child well in excess of the payment father would be obligated to pay pursuant to the guidelines, leaving her with more resources than the guidelines calculation envisioned. Father, on the other hand, will be left with *less* money than the shared-custody-guidelines calculation anticipates he will have to meet his own obligation to support the child directly because the guidelines contemplated that he received as income (and could therefore keep) the $190 derivative benefit that was actually sent to mother.

¶ 31. There is no global "windfall" or undue financial advantage to father here; absent the appropriate credit, father will be left with less money to support the child in his household than required by the guidelines, while mother will be left with more. Accordingly, we hold that when a child receives a derivative SSDI benefit on account of a parent, a shared-custody-guidelines calculation to determine the support obligation as between the parents should incorporate both steps of the *Cantin* analysis — even if application of the credit in the second step of the calculation requires a payment from the parent who actually receives the benefit to the parent to whom it is imputed.[9]

---

[9] The dissent asserts that this decision makes us the first court in the United States to so hold. *Post,* ¶ 60. The cases and scholarly articles cited by the dissent affirm that when the derivative benefit exceeds the noncustodial parent's support obligation in a sole custody situation, the custodial parent is not required to pay the excess to the noncustodial parent in the form of support. *Post,* ¶¶ 57-60. We do not disagree. However, the dissent has not cited a single case in which a court has overridden the results of a *shared*-custody calculation pursuant to the framework we adopted in *Cantin* because it concluded that the flow of dollars — to rather than from the person to whom the derivative benefit is imputed — was wrong. Accordingly, if we affirmed the magistrate's approach, we would likewise be the first appellate court in the country to adopt *that* position. Neither this majority, nor the dissent, has identified any directly on-point cases from other jurisdictions to support our positions. We are in the same boat in that regard.

¶ 32. Finally, the dissent suggests that our approach would force mother to turn over the derivative benefit in violation of her fiduciary duty, and potentially in violation of preemptive federal law. *Post*, ¶¶ 62-69. The dissent's argument is premised on the notion that we hold that the trial court should direct mother to pay the derivative benefit, or a portion thereof, to father. This framing does not match the reality. We do not purport to direct mother as representative payee to transfer the derivative benefit to father; rather, we consider the implications of the derivative payment on the parties' respective obligations. See *Silver v. Pinskey*, 2009 PA Super 183, ¶ 17, 981 A.2d 284 (rejecting father's challenge to child support order that effectively required him to pay mother portion of derivative benefit for which he was representative payee, and explaining that request before court was not to review SSA's designation of father as representative payee but, rather, was to adjust parties' respective child support obligations in view of fact that father was now representative payee, among other factors).

¶ 33. We have previously validated this well-established approach to child support cases involving a derivative SSDI benefit in *Cantin*, 171 Vt. at 662, 770 A.2d at 452, and *Louko*, 2011 VT 33, ¶ 10. The fact that in this case application of the credit results in a net obligation from mother to father does not change the analysis, or transform the child-support calculation into an appropriation of the derivative benefit. As the dissent aptly notes, money is fungible. *Post*, ¶ 69. We do not need to reach the open question of whether federal law would prevent a court from issuing an order directing mother as representative payee to dedicate the derivative benefit to a particular use. *Post*, ¶¶ 68-69. That is not what this Court is doing here. Our order no more requires an appropriation of the derivative benefit than our order in *Louko* allowing father a credit toward child-support arrearages for the excess of a lump-sum-derivative payment. 2011 VT 33, ¶¶ 11-13.[10]

---

[10] To the extent that mother is legally accountable as a fiduciary for her management of the derivative-benefit payment, she may or may not identify her support obligation to father, as opposed to her own direct expenditures in support of the child, as the destination of the SSDI benefit. Even if she traced her child support payment back to the derivative benefit, we find it hard to imagine that payment of court-ordered child support for the benefit of the minor child would constitute a misuse of the funds or a breach of her fiduciary obligations.

¶ 34. The preemption cases cited by the dissent, in contrast, do not involve child support calculations that take into account the effect of derivative or other benefits on the needs and obligations of the respective parents, but rather involve more direct attempts by courts to assign such benefits. In *Guardianship of Smith*, 2011 ME 51, 17 A.3d 136, the trial court ordered father, as representative payee with respect to the disabled child's Supplemental Security Income benefits, to place *a portion of the benefits* in an account to which mother had limited access. Likewise, in *C.G.A. v. State*, 824 P.2d 1364 (Alaska 1992), the Alaska Supreme Court reversed a trial court order requiring representative payee mother pay the monthly Social Security derivative benefit to the state, which had custody of the minor child.

¶ 35. Finally, in *Brevard v. Brevard*, 328 S.E.2d 789 (N.C. Ct. App. 1985), the North Carolina Court of Appeals ruled that the trial court could not require noncustodial father who received a derivative benefit as representative payee to pay mother *the derivative benefit received to date less sums expended by father for the minor child's medical expenses*; however, that court also noted that the courts of North Carolina were free to "enter a child support order after making the findings required under [the state's] statutes, and hold the defendant responsible to pay the amount he has been found capable of paying." *Id.* at 792. The clear implication of the *Brevard* opinion is that a child support order *can* require a representative payee to pay duly-calculated child support to the other parent on account of the income to the representative payee from the derivative benefit. That is exactly what we hold should happen here. In fact, the child support obligation from mother to father on the basis of the guidelines, in the absence of a deviation, would not likely equal the amount of the derivative benefit received by mother.

¶ 36. Accordingly, in the absence of a deviation from the guidelines calculation, father is entitled to an award of child support in the amount of the credit to him for the derivative benefit payment to mother less his child support obligation pursuant to the guidelines.[11]

---

[11] As noted above, at the conclusion of the child support hearing the magistrate specifically stated that if the court concluded that mother owed a child support obligation pursuant to the guidelines calculation, it would then hold a separate hearing to allow mother to present evidence in support of her request for a

## II.

¶ 37. Neither the magistrate nor the family division specifically addressed the proper accounting with respect to the $4370 lump sum derivative benefit arrearage payment to mother on behalf of the minor child. In his motion, father requested that the $4370 sum that had been paid to mother be credited toward father's fifty percent share of the $5780 orthodontic bill. The magistrate treated father's request as a motion to modify the medical support order requiring each parent to pay fifty percent of the cost of uninsured health care expenses; noting that mother's receipt of the lump sum derivative benefit does not change the responsibility of each parent to share in uninsured medical expenses, the magistrate denied father's motion and reiterated that the parties should share the cost of the dental bill. The magistrate did not directly address the question of whether the $4370 received by mother from the SSA on account of father's disability should be applied to father's share, although the implication of the court's ruling is that mother was free to keep and use those funds without any credit toward father's obligations. In affirming, the family court relied on the same analysis as it applied concerning the monthly derivative benefit.

¶ 38. We recently considered an analogous situation in *Louko*. In that case, a noncustodial father with a child support arrearage received retroactive SSDI benefits. SSA sent the lump sum arrearage payment for the derivative children's benefit to mother on behalf of the minor children. Father requested that the payment be treated as a credit toward his child support arrearage; mother objected, arguing that allowing such a credit was tantamount to a retroactive modification of child support. The magistrate and family division disagreed and allowed the credit, and we affirmed.

¶ 39. We explained that the underlying child support order was not modified; rather, the court's order provided that the derivative

---

deviation. In light of our ruling on the guidelines calculation, on remand, the magistrate should complete its consideration of mother's deviation request before issuing a new child support order. In addition, given the length of time it has taken this Court to resolve this appeal, the magistrate may, upon request of either party, reopen the evidence to consider any changes in circumstances that have occurred pending our decision and may, if warranted by the evidence, fashion an order that reflects varying child support obligations throughout the lengthy duration of this appeal, in addition to a prospective obligation.

benefits constituted payment of the ordered child support amount for the period covered by the benefits. We concluded, "Unless the benefit is credited to the child support arrearage, mother will receive a windfall and the possibility of double payment. The applicable statutes do not address the question of what constitutes payment." *Louko*, 2011 VT 33, ¶ 12. We cited with approval a host of cases applying the majority rule that allows full credit toward child support obligations on the basis of an SSDI derivative payment and concluded that allowing the father to credit the lump-sum SSDI payment toward his child support arrearages that accumulated during the time of his disability did not retroactively modify his child support obligation. *Id.* ¶¶ 13, 16.

¶ 40. Although the character of the support obligation in question in this case is different — father's obligation is for uninsured health expenses incurred by the child rather than child support arrearages — the rationale underlying our decision in *Louko* applies with equal force here. Unless the benefit is applied and credited toward father's child support obligations, including those relating to health expenses, mother will receive a windfall and father will be forced to essentially make a double payment — the $4370 on account of his prior earnings that was sent to mother, and his half of the uninsured medical bills.

¶ 41. This conclusion is consistent with the construct that we adopted in *Cantin* and reaffirmed in *Louko*: when an SSDI derivative benefit for a child is payable to a parent other than the disabled parent from whom the payment is derived, we treat the derivative benefit as a payment *to* the disabled parent, followed by a payment *from* the disabled parent to the representative payee. Because the obligation in question — half of the minor child's uninsured medical expenses — is payable to a third party, on remand the magistrate shall ensure that mother applies the lump sum toward father's share of the dental bill, and that father is credited accordingly.

### III.

¶ 42. Finally, father challenges the magistrate's refusal to impute income to mother. "Gross income" for the purpose of calculating child support includes "the potential income of a parent who is voluntarily unemployed or underemployed" unless that parent is physically or mentally incapacitated, is attending a

qualifying vocational or technical education program, or the unemployment or underemployment of the parent is in the best interest of the child. 15 V.S.A. § 653(5)(A)(iii). The determination of whether a party is voluntarily unemployed or underemployed, or whether any of the above-listed exceptions apply, are primarily factual, and we will uphold the magistrate's findings if they are supported by sufficient evidence. See *Tetreault*, 167 Vt. at 399-401, 708 A.2d at 574-75 (applying deferential "clearly erroneous" standard to magistrate's findings regarding imputation of income).

 ¶ 43. In this case, mother testified that she was laid off and was looking for work. On this record, the court's decision not to make a finding that mother was voluntarily underemployed is supported by sufficient evidence in the record.

*Reversed and remanded for further proceedings consistent with this opinion.*

¶ 44. **Dooley, J.,** concurring in part and dissenting in part. In this case, the majority reverses and remands the prospective child support order for a guideline deviation decision. Although I do not agree with the analysis that reached that conclusion, as discussed below, my first response is that there already was a deviation decision by the magistrate, and father failed to appeal it to the superior court. Thus, there is no valid reason why mother should face another deviation determination. Since this point, fully and clearly demonstrated by the record, should end this appeal without the unnecessary analysis of a complicated legal question, we should dismiss this appeal on that basis. I start with this point.

¶ 45. This child support dispute first went to the magistrate on father's motion to modify the preexisting order, which was a "zero child support order." The magistrate made a deviation determination not to change status quo based upon "neither party ha[ving] the current ability to pay child support," and the record supports the family court's affirmance of that decision. The magistrate's decision on whether to modify the on-going child support was stated in ¶ 7 of his order:

> Based upon the nominal child support figures produced from the guidelines the court determines the zero child support order should remain in place. While there has been a showing of a change in circumstances neither party has

the current ability to pay child support to the other. Mother is the sole supporter of her household. Father has limited income but shares household expenses with his spouse.

Thus, the magistrate made his decision not to modify the existing zero-support order based on ability to pay irrespective of the guideline amount, as noted by the family court in upholding the magistrate's decision. The issue the majority decides today was not the basis for either the magistrate's or the superior court's decision[12] and thus cannot properly be the grounds for our decision.

¶ 46. The majority insists that the magistrate did not make a deviation decision. This position is belied by the provision in the magistrate's decision quoted above, particularly in light of the transcript of the proceedings before the magistrate. The magistrate must have reached its decision based either on the guidelines, as possibly modified by our decision in *Cantin v. Young*, or on a deviation from the guidelines — there is no other choice. The magistrate did two alternative guidelines calculations in response to father's motion to modify and rejected them both. Neither resulted in zero child support, the order the magistrate issued. Under the calculation that took into consideration the parties' other dependent children, father would have been obligated to pay mother $26.65 per month. The magistrate decided to deviate from that amount and maintain the zero-support order, however, because "neither party has the current ability to pay child support to the other."

¶ 47. The intention of the magistrate was fully explained on the record at the hearing on father's motion to modify. At the conclusion of the March 8, 2011 hearing, the magistrate stated that it could "take a look at the various guidelines" but "this sounds like it's a request for a deviation from the guideline." The magistrate further explained as follows:

---

[12] Neither the magistrate nor the superior court analyzed the issue on which the majority decides this case. At both levels, the court understood father to be arguing that the court should order that part of the dependent Social Security benefits be allocated to father; father's filings raised the issue in that way. The way that father raised the issue obscured the obvious point that a determination under the guidelines or under *Cantin v. Young* was irrelevant under the rationale for the magistrate's decision. I recognize that father was a self-represented litigant and his arguments should be treated with liberality, but I do not believe he properly preserved the issue.

I don't know that the guidelines fit particularly well with this type of scenario, but I think the best the Court can do is consider the parties' financial resources and circumstances and the needs of the child, go through the various deviation factors and determine whether or not there should be any child support being paid to one party or the other.

Based on what I've heard, my — the Court's inkling would be no, is that the order at zero probably should remain here. It appears that both parties' incomes are at a minimal level, and so I don't see how at this point one party would have the ability to pay support to the other and still maintain the household.

I do not believe it is possible to conclude, based on the oral analysis of the magistrate, that he made a decision based on the guidelines, and not on a deviation from the guidelines. The majority's statement that it is reviewing "the guidelines analysis upon which the·magistrate's [decision] . . . rested," *ante*, ¶ 19, is plainly wrong.[13]

¶ 48. In the majority's view, this was not a deviation decision because the magistrate did not use the word "deviate" in his written order and did not examine the factors contained in 15 V.S.A. § 659. There is no magic in the word "deviate." The magistrate used the term "deviation" in its oral analysis, and the written rationale for his decision is inconsistent with a guidelines-based determination.

¶ 49. Whether the magistrate specifically itemized the factors for deviation in the statute is beside the point. The issue is not whether the court's findings were sufficient to support its decision to deviate,[14] but rather whether it did deviate. Plainly, it did. If the magistrate's analysis was procedurally in error, the proper

---

[13] The majority's statement is not correct. The magistrate never addressed the issue on which the majority renders its decision because, obviously, he did not believe that the issue was in the case before him. Thus, the Court is not reviewing the decision of the magistrate; it is rendering a decision on a ground that the magistrate never knew about.

[14] I note that magistrate proceedings are governed by Vermont Rule for Family Proceedings 8(b), which adopts the procedures in Vermont Rule for Family Proceedings 4, unless there is a specific procedure in Rule 8. In turn, Rule 4(a)(1) adopts the procedures in the Vermont Rules of Civil Procedure, absent a specific, conflicting procedure in that rule. There being no conflicting procedure in either

remedy was to appeal to the superior court on those grounds. It is undisputed that father never did that.

¶ 50. Finally, the majority states that the magistrate did not make a deviation determination because he promised that he would hold a hearing if he were to consider mother's request to deviate from the guidelines. Again, the record does not support this interpretation of what occurred at the hearing. After the magistrate made the statement quoted above, mother's attorney stated that if the magistrate "is considering a deviation *whereunder my client is at risk of appearing to earn more than [father]*" (emphasis added), then mother would want evidence presented on the income provided by father's wife. The magistrate responded as follows:

> Well, the way the Court will leave it is *if* the Court decides that there should be some child support obligation at least preliminarily owed by [mother], then the Court will set the matter over for a brief deviation hearing to hear any relevant evidence on that issue. If it does not, then the Court won't need to hear any additional evidence on the deviation factors.

¶ 51. This statement, in conjunction with previous statements, plainly expresses the magistrate's intention to deviate from the guidelines and to grant the request of mother's counsel to take additional evidence on the income of father's wife only if he preliminarily concludes that mother will have to pay child support to father. The magistrate's conclusion is hardly surprising since both parents have low incomes of similar amounts and are each supporting two children in addition to the child at issue here.

¶ 52. The majority holds that this Court can still reach the guidelines question even though neither the magistrate nor the superior court made a guidelines determination. The magistrate was concerned that the guidelines do not "fit particularly well with this type of scenario" and found that "both parties' incomes are at a minimal level" and no "party would have the ability to pay support to the other and still maintain the household." While the majority may want to address the requirements of the guidelines in shared custody cases involving dependency disability benefits

family rule, Vermont Rule of Civil Procedure 52(a)(1) governs the court's obligation to make findings. In the absence of a specific, timely request to make findings, the magistrate was under no obligation to do so. *Id.*

only to return the case for another deviation decision, the process is unfair to mother, who already has an unchallenged deviation decision.

¶ 53. In short, the magistrate has already made a deviation determination, the family division upheld that determination, and father did not challenge that decision here. We should not reach the guidelines issue that the majority resolves this appeal on, and we should not order a do-over deviation decision. This is my first ground of dissent.

¶ 54. Nevertheless, because the majority reaches the merits of the guidelines question, I will address it. In *Cantin v. Young*, 171 Vt. 659, 770 A.2d 449 (2000) (mem.),[15] we adopted a general set of rules for determining how to allocate SSDI benefits paid directly to a child for purposes of determining the ongoing child support obligation of a parent. We concluded that the amount of the payment to the child should be considered income to the disabled parent and set off against that parent's child support obligation. As we noted, other courts have adopted this approach, largely because it best approximates how the amounts would be allocated if they came from employment wages and were expended for child support.

¶ 55. Today's result, however, is not commanded by our child support statute because the SSDI benefits paid directly to the child would not be considered income to the parent under the statutory definition. See 15 V.S.A. § 653(5). However derived, the benefits are income to the child rather than to either parent. See *Hennagin v. Cnty. of Yolo*, 481 F. Supp. 923, 924 (E.D. Cal. 1979) (citing 42 U.S.C. § 402(d)(1) for the proposition that "[t]hough the children's entitlement to benefits is determined in part upon their father's disabled status, it is the children and not the [disabled parent] who are entitled to the funds"). Our statutes do not specify how income to the child is properly credited.

¶ 56. The general rules in *Cantin* significantly benefit the parent being credited for the derivative benefit. The financial advantage to the SSDI benefit parent from treating 100% of the amount of the benefit as a child support credit will often far exceed any

---

[15] I fully support the *Cantin* rule, but differ with the majority on the elements of the rule. As with any doctrine we adopt based on analyses in other jurisdictions, in *Cantin* we relied on the part of the doctrine applicable to the case before us. This case involves another aspect of the doctrine.

financial disadvantage that may result by treating that amount as income to the benefit parent. In fact, it is entirely possible that the advantage will be so great that it will eliminate any requirement that the benefit parent pay child support out of his or her direct income. This would be the circumstance in this case if there were not shared custody.

¶ 57. As a limit on this potential advantage, courts around the country have held that while the general rule can reduce a parent's child support obligation to zero, it cannot create an obligation for the other parent to pay child support to the SSDI benefit parent. See *Keith v. Purvis*, 2007-CA-00495-COA (¶ 12), 982 So. 2d 1033 (Miss. Ct. App. 2008) (collecting cases from other jurisdictions); see also *Rosenberg v. Merida*, 697 N.E.2d 987, 991 n.7 (Mass. 1998) (holding that noncustodial parent's support obligation is difference between guidelines support amount and credit for derivative benefits, except that when support obligation is less than amount of benefits, "the total support obligation is simply equal to the amount of the SSDI dependency benefits, and the noncustodial parent would not owe any additional amount"); *Diehl v. Diehl*, 913 A.2d 803, 807 (N.J. Super. Ct. App. Div. 2006) (noting that derivative benefit exceeding parent's support obligation is gratuity and may not be credited against past or future support); *Mask v. Mask*, 620 P.2d 883, 885-86 (N.M. 1980) (reasoning that because federal regulations prevent custodial parents from recovering support arrearages from obligor parents' Social Security payments, obligor parents should not be able to do same, and thus concluding that obligor spouse may obtain credit for derivative benefit only up to amount of child support obligation); R. Rains, *Disability and Family Relationships: Marriage Penalties and Support Anomalies*, 22 Ga. St. U. L. Rev. 561, 579 (2006) (noting that courts have "properly rejected" notion that noncustodial parent would get refund or rebate when derivative benefits exceeded child support obligation); T. Kricken, *Child Support and Social Security Dependent Benefits: A Comprehensive Analysis and Proposal for Wyoming*, 2 Wyo. L. Rev. 39, 79-80 (2002) (noting that courts consider amount by which derivative benefits exceed support obligation to be gratuity under equitable considerations); cf. *Keefer v. Keefer*, 239 P.3d 756, 759-60 (Ariz. Ct. App. 2010) (citing guideline providing that amount by which derivative benefits exceed child support obligation may not be treated as payment for arrears or future support).

¶ 58. In sum, the vast majority of courts around the country hold that the second step in the *Cantin* analysis does not permit an excess credit. The few cases to the contrary are based on specific statutory or regulatory language requiring a different result. See, e.g., *Davis v. Davis*, 2010 ND 67, ¶¶ 13-15, 780 N.W.2d 707.

¶ 59. The most common rationale for the majority rule is summarized in *Keith*, 982 So. 2d at 1037: "Social security benefits, to the extent that they exceed a non-custodial parent's monthly support obligation, are equitably deemed a gratuity to the child.". It is not based, as the majority explains, on a rationale that it would be a statutory violation for a custodial parent to pay child support to a noncustodial parent.[16] The point of the rationale is to impose a limit on the financial advantage available to the SSDI benefit parent. Thus, it is fully applicable here.

¶ 60. The majority-rule courts have reached their decisions as part of the general rule of how SSDI benefits are used in calculating child support and not as a discretionary case-by-case determination of where the equities lie. See 15 V.S.A. § 659. As far as I can determine, this decision makes us the first court in the United States to allow the SSDI credit excess to become a child support amount payable to the parent from whom the child's SSDI allowance is derived without a specific statute or rule requiring this result.

¶ 61. The majority justifies its conclusion by relying on the fact that this is a shared custody case. I agree with the majority on how child support is calculated in a shared custody situation and why, but this case is about the allocation of a credit for a SSDI dependency payment directly to the child. The majority rule limits the financial advantage to the SSDI benefit parent irrespective of the custody arrangement. There is nothing special about shared custody for this purpose.

¶ 62. There is another significant reason why I cannot support the majority's position. Mother's obligation to pay child support to

---

[16] As the majority notes, we stated in *Louko v. McDonald*, 2011 VT 33, ¶ 10, 189 Vt. 426, 22 A.3d 433, in a sole custody case, that "[s]ince the children's benefits amount exceeded the amount of the monthly child support obligation, the payment amount was reduced to $0, and there is no debate about that." The majority asserts that this statement was based on the rationale that the custodial parent could not owe child support to the noncustodial parent. In fact, because the point was not disputed, there is no rationale for the *Louko* statement.

father derives from the second step in the process — the credit given to father for the dependent SSDI benefit paid directly to the child through mother as representative payee. In essence, mother is receiving the SSDI benefit on behalf of the child and paying it to father rather than to the child. This result undercuts mother's ability to meet her legal obligations under federal Social Security law.

¶ 63. The SSA provides derivative benefits for dependent children of individuals entitled to Social Security benefits because of, among other things, a parent's disability. 42 U.S.C. § 402(d)(1). Although the beneficiary is the child, payments on the child's behalf may be made to a duly certified fiduciary called a representative payee, who is subject to detailed regulations governing use of the derivative benefits. A representative payee has a responsibility to use such funds "in a manner and for the purposes he or she determines" only for the benefit of the child and consistent with the child's best interests. 20 C.F.R. § 404.2035(a) (2012). Payments certified to a representative payee are used for the benefit of the child if they are applied toward the child's current maintenance, including expenses for food, shelter, clothing, medical care, and personal comfort items. *Id.* § 404.2040(a). Any amount remaining after proper expenditures must be conserved or invested on behalf of the child. *Id.* § 404.2045(a).

¶ 64. A representative payee must account for the use of derivative benefits in written reports submitted at least once a year. 42 U.S.C. § 405(j)(3)(A); 20 C.F.R. § 404.2065. The regulations provide that "[a] representative payee who misuses [derivative] benefits is responsible for paying back misused benefits," 20 C.F.R. § 404.2041(a), thereby "implicitly allowing for a claim by the beneficiary against the payee." *Grace Thru Faith v. Caldwell,* 944 S.W.2d 607, 610 (Tenn. Ct. App. 1996). Further, funds misused by the representative payee may be treated as an overpayment to the representative payee. 20 C.F.R. § 404.2041(a), (f). Finally, representative payees who misuse derivative benefits are potentially liable in state tort actions and are subject to criminal liability for conversion. See 42 U.S.C. § 408(a)(5) (stating that representative payees who knowingly and willfully convert derivative Social Security benefits are guilty of felony and may be fined and imprisoned for up to five years).

¶ 65. As itemized above, federal law imposes serious legal obligations on representative payees accepting derivative Social

Security benefits on behalf of others. Yet, the effect of the majority's holding is to transfer the bulk of the derivative benefit in this case from mother, the representative payee, to father, who would not assume any of the federally imposed legal obligations placed on representative payees to ensure that the funds are used for the child's benefit. In this sense, the majority's holding undercuts mother's ability to comply with her legal obligations under federal law with respect to the derivative Social Security funds entrusted to her for the benefit of the parties' child.

¶ 66. In analogous situations, courts in other jurisdictions are divided on whether the doctrine of federal preemption precludes state courts from exercising jurisdiction to direct a representative payee's disposition of derivative Social Security funds. Compare *C.G.A. v. State*, 824 P.2d 1364, 1367 (Alaska 1992) (concluding that trial court's child support order conflicted with federal Social Security law by requiring mother as representative payee to remit monthly sum equaling delinquent son's derivative Social Security benefit to state to cover youth center costs), *Guardianship of Smith*, 2011 ME 51, ¶¶ 13-14, 17 A.3d 136 (concluding that trial court's order requiring father to deposit portion of son's derivative benefit into joint bank account under control of son, mother, and father's wife conflicted with federal Social Security statutes and regulations giving father as representative payee discretionary authority and responsibility to allocate derivative benefit to son), and *Brevard v. Brevard*, 328 S.E.2d 789, 792 (N.C. Ct. App. 1985) (noting that "the children and not the father are entitled to the [derivative] funds" and concluding that trial court had no authority to order those funds to be transferred from representative payee father to mother as child support for minor children), with *Jahnke v. Jahnke*, 526 N.W.2d 159, 162-63 (Iowa 1994) (concluding that trial court had authority to direct mother as representative payee to pay child's attorney's fees with child's derivative benefit and place remaining funds in trust for parties' child until he reached eighteen years of age), *Catlett v. Catlett*, 561 N.E.2d 948, 953-54 (Ohio Ct. App. 1988) (concluding that federal law did not preclude trial court from exercising its jurisdiction to direct representative payee's use of lump-sum derivative benefit funds and that court did not abuse its discretion by requiring her to place those funds in trust for child), and *Grace Thru Faith*, 944 S.W.2d at 611 (concluding that federal law did not preclude trial court from adjudicating claims that representative payees misused derivative Social Security benefits).

¶ 67. Most of the cases wrestling with whether federal preemption precludes state court jurisdiction in such situations examine the scope and interaction of 42 U.S.C. § 407(a), which prohibits the attachment of Social Security benefits by any legal process, and 42 U.S.C. § 659(b), which excepts situations where legal process is used to enforce a legal obligation of the person receiving the benefits to provide child support. Those courts finding federal preemption have concluded that a child support order is a legal process and that § 659 does not override § 407 with respect to derivative benefits because the child, the owner of the benefits, does not have a legal obligation to provide child support. See, e.g., *C.G.A.*, 824 P.2d at 1367 (holding that child support order was legal process prohibited by § 407 with respect to attachment of derivative Social Security benefits); *Brevard*, 328 S.E.2d at 792 (stating that § 659 does not apply as exception to § 407 with respect to derivative Social Security benefits because children are not individuals obligated to pay child support under state law). In our case, as in these cases, father is a claimant seeking payment for child support from derivative benefits to which the child is entitled. Cf. *In re J.G.*, 652 S.E.2d 266, 272 n.4 (N.C. Ct. App. 2007) (holding that § 407 does not apply unless legal process results from action brought by creditor or claimant).

¶ 68. Whether or not the doctrine of federal preemption applies here is open to debate, but one thing is certain — once the family court crosses the line from offsetting derivative benefits against a child support obligation to requiring the recipient spouse to pay the obligor spouse the amount by which those benefits exceed the support obligation, it undercuts the recipient spouse's ability to comply with the legal obligations set forth in federal Social Security law by effectively directing the representative payee's use of those benefits and transferring the benefits to a spouse who has no legal obligation with respect to the funds under federal law. This is another reason why I do not join the majority's holding that a credit for derivative benefits may extend beyond the amount of the child support obligation.

¶ 69. I do not find it determinative that the majority's holding does not require the family court in this case either to direct the SSA to transfer part of the derivative benefit to father or to direct mother's actual use of the monthly derivative benefit check. Money is fungible. By requiring mother to pay father the exact amount by which the monthly derivative benefit check exceeds father's

monthly child support obligation, the majority is effectively directing the use of the derivative funds from the person who has the legal responsibility for their use to another person with no such legal obligation.

¶ 70. Regarding father's request that mother credit him for his share of the child's $5780 orthodontic bill out of the $4370 lump-sum derivative benefit she received, I agree with the majority that *Louko* controls. In *Louko*, we permitted a credit for child support arrearages accumulated during the time of the disability out of a lump-sum derivative Social Security disability payment. 2011 VT 33, ¶ 16. Here, the $4370 lump sum represents the $190 in monthly derivative Social Security payments over a twenty-three-month period between the time father applied for benefits following his 2008 motorcycle accident and the time his request for benefits was granted in August 2010. The stipulated November 2008 child support order reduced father's monthly child support obligation to zero during most if not all of that period — and thus he could not be credited for child support not paid during the period. The stipulated order, however, retained mother's and father's obligation to split evenly the cost of unreimbursed health expenses, which "are in the nature of child support." *In re Marriage of Casper*, 593 N.W.2d 709, 714 (Minn. Ct. App. 1999) (quotation omitted).

¶ 71. Accordingly, I agree that father may obtain a credit for his share of the orthodontic expenses out of the lump-sum derivative benefit payment. I also agree with the majority's conclusion that the record supports the family court's decision not to find mother voluntarily underemployed.

¶ 72. For the reasons stated above, however, I do not agree that we should reverse the decision of the family court to uphold a zero child support determination by the magistrate. The magistrate clearly made a deviation determination, and father failed to properly challenge the grounds for that determination. The family court's decision should be upheld on that basis.

¶ 73. If we reach the merits of father's challenge, which I would not do, we should affirm the decision of the family court for the reasons I set forth above. Accordingly, I respectfully dissent from the majority decision.